UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HERMAN PAUL CUMBY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:18-cv-30050-MGM |
| | ) | |
| AMERICAN MEDICAL RESPONSE, INC., | ) | |
| ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF DECISION AND ORDER ON THE THIRD PARTIES'
EMERGENCY MOTION TO QUASH SUBPOENA AND DEFENDANT AMERICAN
MEDICAL RESPONSE OF MASSACHUSETTS, INC.'S CROSS MOTION TO
COMPEL
(Dkt. Nos. 43 & 48)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Plaintiff Herman Paul Cumby (Plaintiff) has brought suit against American Medical

Response, Inc. (AMR), American Medical Response of Massachusetts, Inc. (AMR MA), Edward

Van Horne, the president of AMR and AMR MA, David Pelletier, the general manager of AMR

MA (collectively, AMR Defendants), and two emergency medical technicians (EMTs), John Doe

and Jane Doe, who were employed by AMR MA, asserting federal claims under 42 U.S.C. §

1983 and state law (Dkt. No. 1).  Before the court is Advance Local Media, LLC's (MassLive)

and MassLive reporter Dan Glaun's "Emergency Motion to Quash Subpoena[s]" (Dkt. No. 43).

Defendant AMR MA issued subpoenas duces tecum to MassLive and Mr. Glaun and a

deposition subpoena to Mr. Glaun, opposed the emergency motion, and moved to compel

MassLive and Mr. Glaun to comply with the subpoenas (Dkt. No. 48 at 8-9).  The court heard

argument from the parties on December 20, 2018 and took the motions under advisement.  For

the reasons set forth below, the court ALLOWS MassLive's and Mr. Glaun's emergency motion to quash in part and DENIES it in part without prejudice, and ALLOWS AMR MA's motion to compel in part and DENIES it in part without prejudice

II.    RELEVANT BACKGROUND

A.    Facts[1]

Plaintiff's claims against Defendants stem from the events that occurred in and around Nathan Bill's EFP Bar and Restaurant ("Nathan Bill's") in Springfield during the night of April 7, 2015 into the early morning hours of April 8, 2015 (Dkt. No. 1 ¶¶ 20, 23).  At approximately 11:00 P.M. on April 7, 2015, Plaintiff was inside Nathan Bill's with his cousins, Jozelle Ligon and Jackie Ligon,[2] and their friend Michael Cintron (*id.* ¶ 20).  A group of off-duty Springfield police officers, including Daniel Billingsley, his then-girlfriend Melissa Rodriguez, Anthony Cicero, Christian Cicero, and Igor Basovskiy, were also patronizing Nathan Bill's that night (*id.* ¶¶ 22, 23).

At approximately 1:00 A.M. (now April 8, 2015), Billingsley interpreted Jozelle's whistle to a bartender as a "catcall" to Ms. Rodriguez (*id.* ¶¶ 23).  Jozelle left the bar after Billingsley "became aggressive" (*id.* ¶ 24).  Billingsley and two other off-duty officers followed Jozelle outside (*id.*).  Plaintiff, Mr. Cintron, and John Sullivan, one of Nathan Bill's owners and the bar manager, joined them (*id.* ¶ 25).  "When Billingsley rejected efforts to peacefully solve the conflict," Plaintiff, Jackie, Jozelle, and Mr. Cintron walked a short distance to Rocky's Hardware

---

[1] The relevant facts are drawn from the allegations in Plaintiff's complaint, Dkt. No. 1.

[2] Because Jozelle Ligon and Jackie Ligon share the same surname, they will be referenced by their first names to avoid confusion.

store (*id.* ¶¶ 25, 26).  From there, Plaintiff left the group and walked down Allen Street while speaking to his girlfriend on his cell phone (*id.* ¶ 26).

"Right before" 2:00 A.M., Plaintiff walked back toward Nathan Bill's to get his vehicle from Nathan Bill's parking lot (*id.* ¶¶ 21, 27).  As he approached Rocky's Hardware, he saw Jackie, Jozelle, and Mr. Cintron near Murphy's Pop Shop and saw the off-duty officers from Nathan Bill's and about ten others advancing toward them (*id.* ¶¶ 27, 28).  There was a loud whistle, Billingsley allegedly said, "What's up now?" and pushed Jozelle (*id.* ¶¶ 29, 30).  Plaintiff alleges that he attempted to "diffuse the conflict" (*id.* ¶ 30).  When he turned his back on Billingsley and his group, someone struck him from behind knocking him unconscious (*id.* ¶ 31).

On-duty Springfield police officers arrived at 2:04 A.M. (*id.* ¶ 32).  At 2:06 A.M., Defendant AMR MA, which furnished contract emergency ambulance services to the Springfield Police Department, was called to assist a "'man down on the ground'" (*id.* ¶¶ 17, 32).  According to the complaint, "AMR MA first entered Nathan Bill's parking lot at 2:11:27 A.M., where a large majority of the Springfield Police had gathered, and then exited the parking lot [one minute later] and left the vicinity, without attending to . . . Plaintiff who was lying on the ground unconscious" (*id.* ¶ 33).  AMR MA returned "[a]fter some delay," parked near Plaintiff, but did not assist him (*id.* ¶ 34).  When Plaintiff regained consciousness, he tried to sit up and saw uniformed Springfield officers Darren Nguyen and Shavonne Lewis speaking to the AMR MA EMTs, John Doe and Jane Doe (*id.* ¶ 35).  Plaintiff also saw some of the off-duty officers who participated in the attack walking back toward Nathan Bill's (*id.* ¶ 36).

Plaintiff alleges that he needed Mr. Cintron's help to reach the EMTs' location because he was not able to bear weight on his injured leg and the EMTs still did not approach him to offer their assistance (*id.* ¶¶ 37, 39, 40).  When EMT John Doe asked Plaintiff whether he needed

medical attention, Plaintiff responded, "I don't know" (*id.* ¶ 40). EMT John Doe then told

Plaintiff that he "'look[ed] like crap'" (*id.* ¶ 41). Notwithstanding Plaintiff's report that he had

been hit in the head, knocked unconscious, and had "'just got[ten] off the ground,'" EMT John

Doe "briefly" examined Plaintiff's bloody head wounds but did not ask whether he was suffering

from symptoms of a head injury and did not perform any further assessments, such as checking

his pupils or vital signs (*id.* ¶¶ 42, 44). Plaintiff alleges that EMT John Doe's treatment of his

ankle and mouth injuries was similarly subpar (*id.* ¶¶ 46, 48-52).

EMT John Doe asked Plaintiff whether he wanted to be transported to the hospital and,

without discussing Plaintiff's finances or health insurance, added, "'An ambulance trip would be

expensive'" (*id.* ¶¶ 53, 54). Plaintiff sought EMT John Doe's advice regarding whether he

needed emergency treatment at a hospital to which the EMT replied, "'I think you had too much

to drink and should go home and sleep it off'" (*id.* ¶ 55). Plaintiff then drove his vehicle to a

cousin's house where he continued to suffer the effects of his injuries (*id.* ¶¶ 60, 63). Later that

day, Plaintiff went to the Baystate Medical Center emergency room where he was diagnosed

with a concussion, a broken leg, and "a severely dislocated ankle with significant ligamentous

and cartilage injury (requiring surgery and insertion of a metal plate and screws)" (*id.* ¶ 65). In

addition, he lost four upper front teeth (*id.*).

Mr. Glaun conducted interviews that are related to the incident that occurred in or near

Nathan Bill's on April 7-8, 2015. Mr. Glaun interviewed Plaintiff, Jackie, and their attorneys for

an October 16, 2016 MassLive article describing the incident, Plaintiff's medical treatment, and

injuries (Dkt. No. 48-1 at 2-10). All interviewees were identified in the article (*id.*). Mr. Glaun

spoke to Plaintiff and his attorney again and quoted them in an article that appeared on MassLive

on February 3, 2017 (*id.* at 63-67). Jozelle, Jackie, and their attorney were interviewed for an

April 21, 2017 MassLive article authored by Mr. Glaun (*id.* at 112, 113).  Finally, a January 15,

2018 article identified statements obtained from interviews of Plaintiff, his girlfriend, and his

attorney regarding the incident and its aftermath (id. at 115-123).  Other MassLive articles

referenced information gathered from confidential sources (*id.* at 132, 160, 161).[3]

B.    Procedural History

Plaintiff's April 6, 2018 complaint alleges violations of 42 U.S.C. § 1983 and raises

pendant state law claims.  According to the complaint, the violation of Plaintiff's civil rights

stemmed from the EMTs' alleged collusion with Springfield police officers at the scene to deny

Plaintiff appropriate emergency medical treatment based on "his race, assumed socio-economic

status, and the fact that he had been victimized by [off-duty] Springfield police officers" whose

conduct the EMTs and police were purportedly attempting to conceal (Count VII) (Dkt. No. 1 ¶¶

94-102).  In Count VIII, Plaintiff alleges that the AMR Defendants breached their duty to

"properly hire, train, and supervise [their] employees and agents in the appropriate standard of

care that would not violate [Plaintiff's] civil rights" (*id.* ¶¶ 103-107).  Plaintiff brings a similar

claim under the Massachusetts civil rights statute, Mass. Gen. Laws ch. 12, § 11I (Count IX) (*id.*

¶¶ 108-115).  In addition, the complaint includes state law claims of negligence, negligent

infliction of emotional distress, and intentional infliction of emotional distress against the EMTs

(Counts I, II, III) (*id.* ¶¶ 66-79) and against the AMR Defendants for their alleged failure to

"properly hire, train, and supervise [their] employees and agents to provide the appropriate

standard of care" (Counts IV, V, VI) (*id.* ¶¶ 80-93).

---

[3] The facts in this paragraph are inferred from the MassLive articles that were appended to AMR
MA's opposition to the motion to quash (Dkt. No. 48-1).

In the course of discovery, AMR MA issued subpoenas duces tecum to MassLive and to Mr. Glaun based on the MassLive articles Mr. Glaun authored regarding the Nathan Bill's incident (Dkt. No. 45-1 at 2, 6). The subpoena issued to Mr. Glaun also commanded his appearance at a deposition on December 18, 2018 (*id.* at 2).

MassLive and Mr. Glaun moved to quash the subpoenas on December 4, 2018 (Dkt. No. 43). They advanced two grounds for their motion to quash: (1) the government agencies' public records that AMR MA seeks are available from other sources and their production by MassLive would constitute an undue burden; and (2) Mr. Glaun's interviews of witnesses, and his notes, recordings of interviews, and other investigatory materials are privileged and contain information obtained from confidential sources (Dkt. No. 44 at 3-7).

III.    ANALYSIS

A.    Government Agencies' Public Records

1.    Legal Standard

"'Discovery procedures set forth in the Federal Rules of Civil Procedure seek to further the interests of justice by minimizing surprise at trial and ensuring wide-ranging discovery of information.'" *Bingham v. Supervalu Inc.*, Civil Action No. 13-11690-FDS, 2014 WL 12792917, at *2 (D. Mass. May 28, 2014) (quoting *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, Civil Action No. 01-cv-01644-REB-CBS, 2010 WL 502721, *9 (D. Colo. Feb. 8, 2010)). Third-party subpoenas issued in civil cases pending in federal court are governed by Fed. R. Civ. P. 45. *See* Fed. R. Civ. P. 45. "'A Rule 45 subpoena must fall within the scope of proper discovery under Fed. R. Civ. P. 26(b)(1).'" *Green v. Cosby*, 152 F. Supp. 3d 31, 34 (D. Mass. 2015), *modified on reconsideration,* 160 F. Supp. 3d 431 (D. Mass. 2016) (quoting *In re New England*

*Compounding Pharmacy, Inc. Prods. Liab. Litig.*, MDL No. 13–2419, 2013 WL 6058483, at \*4

(D. Mass. Nov. 13, 2013)).  Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that:

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).  "Fed. R. Civ. P. 26(b)(1)(i) generally permits liberal discovery of

relevant information."  *Baker v. Liggett Grp., Inc.*, 132 F.R.D. 123, 125 (D. Mass. 1990).

"Because 'discovery itself is designed to help define and clarify the issues,' the limits set forth in

Rule 26 must be 'construed broadly to encompass any matter that bears on, or that reasonably

could lead to other matters that could bear on, any issue that is or may be in the case.'"  *Bingham,*

2014 WL 12792917, at \*2 (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351

(1978)).

The scope of discovery is not unlimited, however.  *See* Fed. R. Civ. P. 26(b)(2)(C).  The

court is required to restrict discovery if it determines the request to be "unreasonably cumulative

or duplicative, or [if the information] can be obtained from some other source that is more

convenient, less burdensome, or less expensive" or if the request is outside the scope of

discovery permitted by Rule 26(b)(1).  Fed. R. Civ. P. 26(b)(2)(C)(i), (iii).  Discovery is outside

the scope of Rule 26(b)(1) if it is privileged, not relevant to the claim or defense of any party, or

disproportional "to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Because Rule 26 governs

Rule 45 subpoenas, these restrictions apply.

A third party may move to quash or modify the subpoena pursuant to Rule 45(d)(3).  *See*

Fed. R. Civ. P. 45(d)(3).  "Generally, the party moving to quash a subpoena bears the burden of

persuasion." *Bingham,* 2014 WL 12792917, at *2 (citing *Demers v. LaMontagne*, No. Civ.A. 98-10768-REK, 1999 WL 1627978, at * 2 (D. Mass. May 5, 1999)).

        2.        Subpoenas for Production of Government Records

AMR MA claims that MassLive has public records that it has not been able to obtain from government agencies notwithstanding its repeated attempts to get them (Dkt. No. 45-1 at 2, 5, 6, 9; Dkt. No. 48 at 4). In response, MassLive[4] argues that its response to the subpoena would unduly burden its newsgathering function and the records are available from other sources. *See* Fed. R. Civ. P. 45(d)(3)(A)(iv) (requiring a court to quash or modify a subpoena that subjects a person to an undue burden); *see also* Fed. R. Civ. P. 26(b)(2)(C)(i) (courts are required to limit discovery if it "can be obtained from some other source that is more convenient, less burdensome, or less expensive."). The party resisting the subpoena "bears the burden of showing that the subpoena imposes an undue burden, and it 'cannot rely on a mere assertion that compliance would be burdensome and onerous without showing the manner and extent of the burden and the injurious consequences of insisting upon compliance.'" *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.,* 2013 WL 6058483, at *6 (quoting *Sterling Merch., Inc. v. Nestle, S.A.,* Civil No. 06-1015(SEC), 2008 WL 1767092, at *2 (D.P.R. Apr. 15, 2008)). MassLive has sustained its burden.

AMR MA alleges that the motion to quash should be denied because it has exhausted all other avenues to obtain government records of which MassLive allegedly has copies.[5] AMR

---

[4] AMR MA's subpoenas to MassLive and Mr. Glaun request the same records (Dkt. No. 45-1 at 5, 9). Consequently, for purposes of this discussion, the court's reference to MassLive's public records includes Mr. Glaun's records to the extent there is a difference.

[5] It is unclear from the court's record whether MassLive has copies of any public records that AMR MA has not obtained. For purposes of the analysis, however, the court presumes that MassLive has additional public records.

MA obtained the Springfield Police Department Internal Investigation Unit's (IIU) seventy-four page special report to the commissioner dated August 3, 2015, which references portions of the Major Crimes Bureau's investigation, through a request to the City of Springfield under the Massachusetts public records law, Mass. Gen. Laws ch. 66, § 10 and Mass. Gen. Laws ch. 4, § 7, cl. Twenty-sixth (Dkt. Nos. 48-4, 48-5).[6]  Relying on the public records law's exemption for investigatory materials, Mass. Gen. Laws ch. 4, § 7, cl. Twenty-sixth (f), the city denied AMR MA's other requests for substantially the same materials that it is requesting from MassLive (Dkt. Nos. 48-4, 48-6 at 2-4).[7]  The Springfield Police Department produced the same IIU report in response to AMR MA's subpoena (Dkt. No. 48-6).  Citing an "investigation [by] outside agencies," the police department, through the city, again denied AMR MA's other requests (Dkt. No. 48-6 at 2).  AMR MA came up empty handed when it issued a subpoena to the attorney for Jackie, Jozelle, and Mr. Cintron, who have instituted a civil suit based on the Nathan Bill's incident (Dkt. Nos. 48 at 5, 48-7).  AMR MA alleges that it cannot obtain the public records from Plaintiff either (Dkt. No. 48 at 5).  At the hearing on the instant motion, Plaintiff's attorney agreed to produce to AMR MA the video recording of Plaintiff's police interview.  She represented that she has provided all other government materials that are in Plaintiff's possession, custody, or control.

---

[6] Citing Mass. Gen. Laws ch. 4, § 7, cl. Twenty-sixth (c), the city redacted portions of the report (Dkt. No. 48-5 at 4).  Clause Twenty-sixth (c) exempts from disclosure "personnel and medical files or information; also any other materials or data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy."  Mass. Gen. Laws ch. 4, § 7, cl. Twenty-sixth (c).

[7] Clause Twenty-sixth (f) exempts from disclosure "investigatory materials necessarily compiled out of the public view by law enforcement or other investigatory officials the disclosure of which materials would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest."  Mass. Gen. Laws ch. 4, § 7, cl. Twenty-sixth (f).

Citing the burden the production of records will impose on its newsgathering purpose, MassLive objects to AMR MA's subpoena for public records. *See* Fed. R. Civ. P. 45(d)(3)(A)(iv). "'If the material sought by subpoena is readily available, either from a party to the action or from a public source, obtaining it through subpoena on a nonparty often will create an undue burden. The mere availability of the documents from [a public] source, however, does not preclude a subpoena directed to a nonparty if the party serving the subpoena can show that it is more expeditious to obtain the documents from a witness.'" *In re New England Compounding Pharmacy, Inc. Prods. Liab. Litig.*, 2013 WL 6058483, at *7 (quoting *Gray v. Town of Easton*, No. 3:12cv166(RNC), 2013 WL 2358599, at *3 (D. Conn. May 29, 2013)). The relative ease with which AMR MA could obtain the public records from MassLive must be weighed against the burden that will be imposed on MassLive if it is required to produce them. *See Charvat v. Travel Servs.*, No. 12 CV 5746, 2015 WL 76901, at *2 (N.D. Ill. Jan. 5, 2015) (quashing a nonparty subpoena because the requested information was available from public sources, including by means of a court order, and, on balance, the subpoena imposed an undue burden on the third party).

MassLive points out that, as a general matter, if it is required to produce copies of the records its reporters assemble, its newsgathering and reporting functions will be unduly burdened by the expenditure of time and resources that will be needed to respond to civil litigants' subpoenas for public records that it acquires in the course of its investigative reporting (Dkt. No. 44 at 3-5). Mr. Glaun obtained government records by using "legally available channels," including making public records requests to government agencies (Dkt. No. 46 ¶¶ 4, 5). MassLive asserts that AMR MA is attempting to shortcut its discovery efforts by piggy backing on Mr. Glaun's work as a reporter (Dkt. No. 44 at 3-5). According to MassLive, if it is required

to produce public records to a civil litigant in discovery, it will be hesitant to request similar information from government agencies in the future (*id.*). This, in turn, will hamper its ability to inform the public about governmental actions. In the court's view, this argument carries considerable weight.

The potential availability of the public records "from some other source that is more convenient, less burdensome, or less expensive" also weighs in MassLive's favor and against AMR MA. Fed. R. Civ. P. 26(b)(2)(C)(i). *See Isola USA Corp. v. Taiwan Union Tech. Corp.*, No. 15-MC-94003-TSH, 2015 WL 5934760, at *3 (D. Mass. June 18, 2015), *report and recommendation adopted,* No. 15-MC-94003-TSH, 2015 WL 5944286 (D. Mass. Feb. 2, 2015) ("'Although discovery is by definition invasive, parties to a law suit must accept its travails as a natural concomitant of modern civil litigation. Non-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs.'") (quoting *Cusumano v. Microsoft Corp.,* 162 F.3d 708, 717 (1st Cir. 1998)). Because MassLive obtained the materials through requests to government agencies under the Massachusetts public records law, it is reasonable to expect AMR MA to do the same.

"The primary purpose of [the public records law] is to give the public broad access to governmental records." *Worcester Telegram & Gazette Corp. v. Chief of Police of Worcester,* 764 N.E.2d 847, 851 (Mass. 2002). *See Globe Newspaper Co. v. Boston Retirement Bd.,* 446 N.E.2d 1051, 1057 (Mass. 1983). For purposes of the public records law, parties to civil litigation have the same status as other members of the public. *See DaRosa v. City of New Bedford,* 30 N.E.3d 790, 803 (Mass. 2015); *In re Subpoena Duces Tecum*, 840 N.E.2d 470, 472-73 (Mass. 2006). "Under the public records law, there exists 'a presumption that the record

sought is public' . . . . " *Globe Newspaper Co. v. Police Comm'r of Boston*, 648 N.E.2d 419, 424 (Mass. 1995) (quoting Mass. Gen. Laws ch. 66, § 10(c)). However, "[n]ot every record or document kept or made by the governmental agency is a 'public record,'" as that term is defined by Mass. Gen. Laws ch. 4, § 7, cl. Twenty-sixth. *Suffolk Constr. Co. v. Div. of Capital Asset Mgmt.,* 870 N.E.2d 33, 41 (Mass. 2007). "The statute specifies fifteen categories of materials or information that fall outside the definition of a 'public record,' either permanently or for a specified duration." *Id. See* Mass. Gen. Laws ch. 4, § 7, cl. Twenty-sixth (*a* )-(*u*); *Fast Enters, LLC v. Pollack*, Civil Action No. 16-cv -12149-ADB, 2018 WL 4539685, at *2 (D. Mass. Sept. 21, 2018) ("Under the Massachusetts public records law, documents must be disclosed unless they are 'specifically or by necessary implication exempted from disclosure by statute,' Mass. Gen. Laws ch. 4, § 7(26)(a)."). Springfield cited the exemption for investigatory materials as a basis for not producing some of the records that AMR MA requested (Dkt. Nos. 48-5 at 4-5, 48-6 at  2). *See* Mass. Gen. Laws ch. 4, § 7, cl. Twenty-sixth (f). But if the records that AMR MA seeks were released previously to the public, including to MassLive, the records' custodians may not have grounds for withholding them in response to a public records request notwithstanding an ongoing investigation. *See, e.g., In re Subpoena Duces Tecum,* 840 N.E.2d at 475 (whether the information was "already known" was a factor used in determining whether the records were public); *Globe Newspaper Co.,* 648 N.E.2d at 427-28 ("prior publicity" is relevant to release of investigatory materials). Alternatively, AMR MA can request the court to order the government agencies to produce the documents. *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996) ("Federal courts have inherent powers necessary to achieve the orderly and expeditious disposition of their dockets.") (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991)).

Given the burden the subpoena's enforcement would impose on MassLive's function as a news organization and the potential availability of the records from alternative sources, MassLive has demonstrated that its interest in protecting its newsgathering and reporting functions from civil litigants' information requests outweighs AMR MA's interest in obtaining discovery of the records from MassLive. Accordingly, the court grants the motion to quash the subpoenas for the records of government agencies and denies AMR MA's motion to compel the production of these materials.

  B.  <u>Material Concerning Mr. Glaun's Reporting of the April 8, 2015 Incident</u>

  AMR MA seeks deposition testimony from Mr. Glaun concerning his investigation and reporting on the Nathan Bill's incident. In addition, AMR MA seeks the following materials regarding Plaintiff: documents concerning him and his statements; documents that he provided; photographs; and audio and video recordings of his interviews (Dkt. No. 45-1 at 2, 5, 6, 9). AMR MA has also subpoenaed all documents concerning Jozelle, Jackie, Mr. Cintron, their statements, and the incident that occurred on April 8, 2015 (*id.*). Further, AMR MA seeks all documents identifying witnesses to the incident and concerning witnesses' statements, and all photographs, audio and video recordings regarding the incident (*id.*).

  Relying on Fed. R. Civ. P. 45(d)(3)(A)(iii), which requires a court to quash a subpoena that requests "disclosure of privileged or other protected matter, if no exception or waiver applies," Mr. Glaun and MassLive claim that the material AMR MA seeks is protected by the qualified privilege afforded to journalists.

  1.  The federal law of privilege controls.

  In view of the fact that the complaint raises both federal and state claims, that Mr. Glaun and MassLive claim a news reporter's privilege, and that federal and Massachusetts law

regarding a possible reporter's privilege differ, the law applicable to the discovery dispute must first be determined. *See Holton v. Rothschild,* 108 F.R.D. 720, 722 (D. Mass. 1985) ("the First Amendment may provide a qualified privilege under federal common law" while Massachusetts does not recognize any formal reporter's privilege) (citing *In re Roche,* 411 N.E.2d 466, 474 n.13 (Mass. 1980)). "Rule 501 of the Federal Rules of Evidence governs claims of privilege in the federal courts." *United States v. Pineda-Mateo*, 905 F.3d 13, 21 (1st Cir. 2018) (citing *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)). Rule 501 states:

> The common law -- as interpreted by United States courts in the light of reason and experience -- governs a claim of privilege unless any of the following provides otherwise:
>
> • the United States Constitution;
>
> • a federal statute; or
>
> • rules prescribed by the Supreme Court.
>
> But in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision.

Fed. R. Evid. 501.

Here, Plaintiff raises federal claims based on § 1983 and state law claims based on pendant and diversity jurisdiction (Dkt. No. 1 ¶ 1). Plaintiff's allegation that the EMTs provided substandard care on April 8, 2015 is common to all claims (*see, e.g., id.* ¶¶ 68, 72, 76, 98, 106). "In such situations courts consistently have held that the asserted privileges are governed by the principles of federal law." *von Bulow v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (citing *Wm. T. Thompson Co. v. Gen. Nutrition Corp.,* 671 F.2d 100, 104 (3d Cir. 1982); *Mem'l Hosp. for McHenry Cty. v. Shadur,* 664 F.2d 1058, 1061 n.3 (7th Cir. 1981)). *See Vanderbilt v. Town of Chilmark*, 174 F.R.D. 225, 226–27 (D. Mass. 1997) ("Rule 501 does not instruct a federal court on which law of privilege to use in a federal question case where the court is also hearing a

state law claim pursuant to supplemental jurisdiction. Every circuit that has reached this issue has held that, in a situation such as the one before this court, the federal law of privilege applies.") (citing cases); S. Rep. No. 1277 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7059 n.16 ("It is also intended that the Federal Law of privileges should be applied with respect to pendant State law claims when they arise in a Federal question case.").

2.    The First Amendment Analysis

Mr. Glaun argues that information identifying his confidential sources and information he obtains from such sources are entitled to protection because disclosure will "irreparably damage" his relationships with sources upon whom he relies to gather information for news articles (Dkt. No. 46 ¶¶ 6-9). Although "[t]he First Circuit has not decided the 'semantic question of whether the protection afforded to a journalist's sources and research is a type of privilege,'" *Alharbi v. Theblaze, Inc.*, 199 F. Supp. 3d 334, 348 (D. Mass. 2016) (quoting *Cusumano*, 162 F.3d at 716) (internal alterations omitted), the court has addressed "the extent to which the First Amendment protection afforded to a journalist's news-gathering activities prevents the journalist from being required to reveal the identity of confidential sources" or information.[8] *In re Special Proceedings*, 291 F. Supp. 2d 44, 53 (D.R.I. 2003), *aff'd,* 373 F.3d 37 (1st Cir. 2004) (citing *Cusumano,* 162 F.3d at 708; *LaRouche Campaign,* 841 F.2d at 1176; *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir. 1980)). "[C]ourts faced with enforcing requests for the discovery of materials used in the preparation of journalistic reports should be aware of the possibility that the unlimited or unthinking allowance of such requests will impinge upon First Amendment rights." *Bruno & Stillman, Inc.*, 633 F.2d at 595. *See Cusumano*, 162 F.3d at

---

[8] There is no federal common law reporter's privilege that is distinct from the First Amendment. *See United States v. LaRouche Campaign,* 841 F.2d 1176, 1178 n.4 (1st Cir. 1988).

714 ("Journalists are the personification of a free press, and to withhold . . . protection [from discovery] would invite a 'chilling effect on speech,' and thus destabilize the First Amendment.") (quoting *LaRouche Campaign,* 841 F.2d at 1181). "In determining what, if any, limits should accordingly be placed upon the granting of [discovery] requests, courts must balance the potential harm to the free flow of information that might result against the asserted need for the requested information." *Bruno & Stillman, Inc.,* 633 F.2d at 595-96. "This test contemplates consideration of a myriad of factors, often uniquely drawn out of the factual circumstances of the particular case." *Cusumano*, 162 F.3d at 716.[9]

In applying the balancing test, "[e]ach party comes . . . holding a burden." *Id.* (citing *Bruno & Stillman, Inc.,* 633 F.2d at 597).

> Initially, the movant must make a prima facie showing that his claim of need and relevance is not frivolous. Upon such a showing, the burden shifts to the objector to demonstrate the basis for withholding the information. The court then must place those factors that relate to the movant's need for the information on one pan of the scales and those that reflect the objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends on the opposite pan.

*Id.* (citing *Bruno & Stillman, Inc.,* 633 F.2d at 597-98). Applying this legal framework to the specific circumstances of the instant case, the balancing test weighs in favor of allowing AMR MA's motion to compel Mr. Glaun's deposition testimony and the subpoenas for production of documents, subject to Mr. Glaun's right to invoke confidentiality as to information and documents to the extent the questions and document requests seek confidential information.

---

[9] Although MassLive's and Mr. Glaun's arguments mostly rely on Massachusetts law (Dkt. No. 44), the balancing test applied by Massachusetts courts is substantially similar to the one employed by the courts of this circuit. *See, e.g., In re John Doe Grand Jury Investigation,* 574 N.E.2d 373, 375 (Mass. 1991) ("the balancing principles stated in Petition for the Promulgation of Rules, that call for weighing (a) the public interest in having every person's evidence available against (b) the public interest in the free flow of information.") (citation omitted). *See Alharbi,* 199 F. Supp. 3d at 348.

The information that Mr. Glaun has gleaned is "more than remotely relevant" to Plaintiff's civil suit. *Bruno & Stillman, Inc.,* 633 F.2d at 597. According to the complaint, Jozelle, Jackie, Mr. Cintron, and Officers Nguyen and Lewis were percipient witnesses to the interactions between Plaintiff and the EMTs (Dkt. No. 1 ¶¶ 29, 35, 38). The case appears likely to be a credibility contest; that is, Plaintiff's and his group's version of the incident and the EMTs' response and treatment of Plaintiff at the scene juxtaposed against the EMTs' version. Thus, any inconsistent statements that Plaintiff or his cousins made to Mr. Glaun are relevant to the claims at issue in the law suit. Mr. Glaun and MassLive do not raise a contrary contention (Dkt. No. 44 at 5-7). *See Nat'l Liab. & Fire Ins. Co. v. Carman,* C.A. No. 17-038WES, 2019 WL 418426, at *1 (D.R.I. Feb. 1, 2019) (permitting discovery of defendant's statements and sworn testimony and finding they were relevant for impeachment purposes where his credibility and intent were at issue) (citing *Rubenstein v. Kleven,* 21 F.R.D. 183, 184 (D. Mass. 1957)). In addition, AMR MA may need Mr. Glaun's information if the substance of his interview materials is not available from nonconfidential sources. *See Alharbi*, 199 F. Supp. 3d at 348 ("the Supreme Court has 'twice rejected any automatic requirement that non-confidential sources be exhausted.'") (quoting *In re Special Proceedings,* 373 F.3d at 45 (citing *Univ. of Pa. v. E.E.O.C.,* 493 U.S. 182, 201 (1990); *Branzburg v. Hayes,* 408 U.S. 665, 701-02 (1972)).

In view of the record, the material submitted by MassLive and Mr. Glaun do not demonstrate a need to preserve confidentiality that outweighs AMR MA's need for the information that it seeks. "Not all information [assembled by journalists] is equally deserving of confidentiality." *Bruno & Stillman, Inc.,* 633 F.2d at 597. Mr. Glaun's MassLive articles name his sources of information – Plaintiff, his girlfriend, his attorney, Jackie, Jozelle, and their attorney – and contain direct quotes from interviews (Dkt. No.48-1 at 2-16, 63-67, 112, 113,

115-23). Mr. Glaun's averment that he guaranteed confidentiality to the interviewees is absent from the affidavit he submitted in support of the motion to quash (Dkt. No. 46). *See LaRouche Campaign*, 841 F.2d at 1181 ("We have been referred to no authoritative sources demonstrating or explaining how any chilling effect could result from the disclosure of statements made for publication without any expectation of confidentiality."); *Bruno & Stillman, Inc.,* 633 F.2d at 599 (remanding based, in part, on the fact that the court had no "analysis of the [reporter's] commitment to confidentiality pertaining to various sources.").

Although Mr. Glaun may have promised some degree of confidentiality to Plaintiff and the other individuals he interviewed regarding the Nathan Bill's incident and he may have relied on confidential sources, the court does not have enough information at this stage of the litigation to determine whether that, in fact, occurred. AMR MA has indicated that it does not seek confidential sources and information (Dkt. No. 48 at 5 n.5). However, it seems likely that AMR MA will inquire into areas that might require Mr. Glaun to reveal confidential sources or information. In the alternative, the contents of documents to which Mr. Glaun gained access may reveal confidential sources. *See Alharbi*, 199 F. Supp. 3d at 347 (the First Circuit and Massachusetts appellate courts have reversed and remanded decisions on discovery motions where it was not clear from the record whether a reporter's sources received promises of confidentiality or whether the reporter relied on information from confidential sources) (citing *Bruno & Stillman, Inc.,* 633 F.2d at 599; *Wojcik v. Boston Herald,* 803 N.E.2d 1261, 1266 (Mass. App. Ct. 2004)). In view of Mr. Glaun's failure to demonstrate a blanket need for confidentiality, he has not established a basis for granting the motion to quash the deposition subpoena in its entirety at this time. *See Green,* 152 F. Supp. 3d at 35 ("it is 'very unusual for a court to prohibit the taking of a deposition altogether.'") (quoting *E.E.O.C. v. Freudenberg–NOK*

*Gen. P'ship*, Civil No. 07-cv-406-JD, 2009 WL 909571, at *3 (D.N.H. Apr. 3, 2009)).  If Mr.

Glaun declines to reveal confidential sources or information during the deposition and he and

AMR MA are unable to resolve their dispute after conferring, *see* LR 7.1, and if AMR MA then

files a motion to compel, the court will be better able to evaluate the issues in the context of

concrete facts.  *See Alharbi,* 199 F. Supp. 3d at 349 (quoting *Wojcik*, 803 N.E.2d at 1266).

Consequently, the motion to quash the deposition subpoena is denied without prejudice and

AMR MA's motion to compel Mr. Glaun's deposition is allowed.

Applying the same analysis to the subpoenas for production of the nongovernmental

agency materials that MassLive and Mr. Glaun garnered during the investigation of the Nathan

Bill's incident, the motion to quash is denied without prejudice and AMR MA's motion to

compel the production of the investigatory materials is allowed subject to Mr. Glaun's assertion

of confidentiality as to specifically identified material for specifically identified reasons.

IV.   CONCLUSION

MassLive's and Mr. Glaun's Emergency Motion to Quash Subpoena (Dkt. No. 43) is

ALLOWED to the extent AMR MA seeks to obtain public agencies' materials that are available

from sources other than MassLive.  To the extent the subpoenas seek Mr. Glaun's deposition and

materials related to his investigation, it is DENIED without prejudice.  AMR MA's motion to

compel (Dkt. No. 48) is DENIED to the extent it seeks public agencies' materials and it is

ALLOWED as to the deposition of Mr. Glaun and the subpoenas for the materials related to his

investigation subject to Mr. Glaun's assertion that specifically identified material should remain

confidential for specifically identified reasons.

It is so ordered.

Date:   March 11, 2019                                  /s/ Katherine A. Robertson
                                                        KATHERINE A. ROBERTSON

U.S. MAGISTRATE JUDGE